# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

ANGELA BODMAN,          )
                                   )
             Plaintiff,        )
                                   )
v.                              )   Docket No. 2:10-cv-105-GZS
                                   )
STATE OF MAINE, DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES,   )
                                   )
            Defendant.     )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment (Docket #25) filed by Defendant State of Maine, Department of Health and Human Services ("DHHS"). As explained herein, the Court GRANTS Defendant's Motion.

## I.    SUMMARY JUDGMENT STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In

determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. <u>Santoni v. Potter</u>, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." <u>Triangle Trading Co. v. Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); <u>see also</u> Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." <u>Barros-Villahermosa v. United States</u>, -- F.3d --, No. 09-2614, 2011 WL 1447743, at *2 (1st Cir. Apr. 15, 2011) (quoting <u>Rivera-Marcano v. Normeat Royal Dane Quality A/S</u>, 998 F.2d 34, 37 (1st Cir. 1993)); <u>see also</u> <u>Wilson v. Moulison N. Corp.</u>, -- F.3d --, No. 10-1387, 2011 WL 977528, at *3 (1st Cir. Mar. 21, 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." <u>In re Spigel</u>, 260 F.3d 27, 31 (1st Cir. 2001) (quoting <u>In re Ralar Distribs., Inc.</u>, 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    FACTUAL BACKGROUND

Construing the parties' statements of material facts in accordance with the above standards and Local Rule 56[1] reveals the following:

---

[1] In so doing, the Court has resolved all of the various motions to strike contained within each party's response to the other party's proposed statement of material facts. (<u>See</u> Pl.'s Objections & Opp'n to Def.'s Statement of Mat. Facts ("Pl.'s Opp'n Facts") (Docket #35); Def's Resp. to Pl.'s Statement of Add'l Mat. Facts ("Def.'s Resp. Statement") (Docket #44).) The final outcome of the case, however, was not in any way contingent upon the Court's decision on any of these motions.

Plaintiff Angela Bodman started working for the State of Maine in 1997 as clerk typist for the Department of Behavioral and Developmental Services.[2]  Bodman resigned from state service in early 2001 shortly following the birth of her daughter.  In November of 2001, when her daughter was about one year old, Bodman returned to work in the same office but as a temporary contract worker on various, intermittent projects.  Bodman was formally rehired into state service on July 14, 2003.  On February 2, 2004, Bodman was promoted to the position of Family Independence Specialist, working out of DHHS' facility located on Marginal Way in Portland, Maine.  In June of 2007, Suzanne Lapierre (formerly Fitts) became Bodman's immediate supervisor.

Bodman received a copy of DHHS' Policy Prohibiting Employee Harassment ("Harassment Policy") the day following her promotion.  This Harassment Policy was revised and reissued on July 2, 2004, and DHHS issued annual notifications of this Harassment Policy to all employees each year from 2005 through 2008.  (See Pomelow Aff. ¶¶6-8 (Docket #29) & Exs. A-F (Docket #s 29-1 to 29-7).)  DHHS' Harassment Policy includes a complaint procedure which provides that an employee may file a complaint of harassment by contacting his/her immediate supervisor or any supervisor in the chain of command, Bureau of Employee Relations Equal Employment Opportunity ("EEO") Coordinator, State EEO Coordinator, or DHHS' Service Center Director of Human Resources.  The Harassment Policy applies both to DHHS employees and non-employees alike, and applies to outside activities related to the workplace, parties, trips and conferences.

DHHS also has a policy relating to Domestic Violence, Sexual Assault and Stalking in the Workplace ("Domestic Violence Policy").  (See Pomelow Aff. Ex. G (Docket #29-8).)

---

[2] Effective July 1, 2004, the Department of Behavioral and Developmental Services and the Department of Human Services merged to become the Department of Health and Human Services.  (Def.'s Mot. for Summ. J. at 3 n.5 (citing P.L. 2003, c. 689 (effective July 1, 2004)).)  As shorthand, the Court will refer to the Department for which Plaintiff worked as "DHHS" for all time periods, including those preceding July 1, 2004.

Under the Domestic Violence Policy, DHHS offers support and referrals for assistance to those employees who disclose domestic violence concerns or who request assistance. The Domestic Violence Policy designates specific employees in each individual office with specialized training to handle disclosures, referrals, and office safety planning. (See id. at 4-5.) Bodman received training regarding the Domestic Violence Policy. The Domestic Violence policy applies to both DHHS employees and non-employees alike.

In November of 2006, Bodman began an intimate relationship with Michael Damon, a coworker employed by DHHS as a non-supervisory human services caseworker at DHHS' Marginal Way office.[3] In February or March of 2007, Bodman became increasingly "concerned" with Damon's behavior. (Bodman Dep. Excerpts & Exs. ("Bodman Dep.") (Docket #26-1) at 9.)[4] As a result, Bodman attempted to end the relationship. At the time, Damon told Bodman that if she followed through he would get her fired, have her daughter taken away from her, and that he would kill himself.

On March 28, 2007, Damon was placed on administrative leave for inappropriate conduct in the workplace; the misconduct was not directly connected to his relationship with Bodman, though some of it was sexual in nature. After he was officially terminated from state service— which was effective as of May 4, 2007—Damon found a job with the Shalom House, a social services organization in Portland with a similar client base as that of DHHS. In the course of his employment at Shalom House, Damon would occasionally have professional obligations to attend to at DHHS' Marginal Way office.

After Bodman first attempted to end her relationship with Damon, he became increasingly physically and verbally abusive. Bodman definitively ended the relationship

---

[3] Bodman was married, but separated, at the time she began dating Damon.

[4] Throughout this Court Order, all deposition transcript and exhibit citations are to the CM-ECF document page number rather than to the internal transcript or exhibit page number.

sometime before September 18, 2007. (See Bodman Dep. at 14.) On November 5, 2007, Bodman applied for a Temporary Protection from Abuse Order ("Temporary Order") in the Portland, Maine District Court.

In her application for this Temporary Order, Bodman averred that Damon had: physically restrained her "[o]n countless occasions"; "snapped" her cell phone to prevent her from calling the police; threatened her life with a claimed gang affiliation; stated he was doing drugs and acted erratically; scared her to the point that she would block her doors; called her names, spit on her, poured drinks on her head, and told her that she had "nothing to live for"; one time prevented her from leaving his car by bending her wrist and hitting her on the throat; slashed her car tires twice in the past week alone; and continued to be seen in the area of her home and work despite no longer living and working there. (See Bodman Dep. at 97.) Bodman additionally claimed that after she stopped responding to Damon's repeated text messages and changed her personal telephone number, Damon started contacting her using her state email address. Based on this information, Bodman obtained the Temporary Order that same day. Among other things, this Order prohibited Damon from having any contact with Bodman, directly or indirectly, including being at or in the vicinity of her place of employment "repeatedly and without reasonable cause." (Bodman Dep. at 92.)

Of the incidents detailed by Bodman in her request for the Temporary Order, the emails from Damon to Bodman's state email account were the only ones that occurred at her workplace using state resources.[5] Between September 18, 2007 and November 6, 2007, Bodman received

---

[5] (See Bodman Dep. at 12-16 (stating, *inter alia*, that the specific threats and abuse detailed in the Temporary Order had all been made in person at her apartment or car, and that Damon had not threatened her or called her derogatory names *via* her state phone line or email); see also Pl.'s Opp'n Facts ¶22 (admitting that the tiring slashing occurred at Bodman's apartment).)

thirty-nine emails from Damon *via* her state email account.  (<u>See</u> Bodman Dep. at 46-91 (copies of all thirty-nine emails).)

Bodman first told Lapierre,[6] her supervisor at DHHS, about her ongoing problems with Damon on November 5, 2007, just before she went to court to apply for the Temporary Order.[7] With Bodman's permission, Lapierre then consulted with her co-supervisor, Alan Robitaille. Later that same day, Bodman provided Lapierre with a copy of the Temporary Order.  Lapierre then met with her own supervisor, Terry Hamilton, and DHHS Personnel Officer Lynn Hadyniak about the information Bodman had shared, including a suggestion by Bodman that her email address be changed.  Immediately following this meeting, Hadyniak requested that the State's Office of Information Technology change Ms. Bodman's email address.  Given that this change would take time to get implemented—indeed, the address change ultimately took three weeks— it was recommended to Bodman that she change her email account settings to block any incoming email from Damon; Bodman, however declined to make this change.

Without additional direct input from Bodman, a safety plan was developed by DHHS staff in conjunction with Human Resource personnel.  In addition to the email address change, the plan included: changing Bodman's parking to the front of the building so that Bodman could see who was in the parking area before she left the building; providing Bodman with an escort from the building to her car; adding more flexibility to Bodman's schedule to allow her to take time off to attend court proceedings and related appointments; removing Bodman from the reception area on the day Damon was to be served with the Temporary Order; notifying

---

[6] At the time, Lapierre's last name was Fitts.

[7] (<u>See</u> Bodman Dep. at 10 ("I didn't tell my supervisor about my problems until the same day I went to the court to get the [Temporary Order]."); <u>id.</u> (responding "yes," to the questions "And that was the first time that you told your supervisor? --about Mr. Damon? --and the problems you were having?"); <u>id.</u> at 14 (responding "yes" to the question "And the first time that you told anybody, any supervisor, at DHHS about those e-mails was on November 5, 2007?").)

reception to alert the supervisor on duty so that a supervisor could be present in the reception area in the event that Damon later had to be in the building for professional reasons; and instructing Bodman to set her office telephone to go automatically to voicemail and to forward any voicemail from Damon to her supervisor.[8]

Damon was served with the Temporary Order on or about November 6, 2007. After November 6, 2007—the day after Bodman first notified Lapierre about the abuse—there was no further contact between Damon and Bodman at DHHS using DHHS resources. Bodman received no further email from Damon on her state email account and received no telephone calls from Damon on her work telephone number. (See Bodman Dep. at 14, 16) Damon did not enter DHHS' Marginal Way office during business hours. (See Bodman Dep. at 19.)

On or about November 28, 2007, Bodman was informed by a coworker that Damon had revealed to at least one DHHS client that the Temporary Order prevented him from entering the DHHS Marginal Way office. Bodman told Lapierre that she was concerned that Damon was speaking with DHHS clients about her. Lapierre requested that Bodman tell her the name of the coworker so that the matter could be looked into; not wanting to get any other coworkers involved, Bodman, however, declined to give her supervisor the name of the coworker who had passed on the story.

A hearing on the final protection order was held on December 28, 2007. At the request of Bodman's attorney, Lapierre testified—without a subpoena—on Bodman's behalf. On December 28, 2007, the court granted the final Order for Protection from Abuse ("Final Order"). The Final Order continued the no contact provisions in the Temporary Order, but added a

---

[8] (See Bodman Dep. at 18, 22 (discussing several components of this safety plan); Lapierre Aff. (Docket #26-4) ¶7 (describing the safety plan in detail).)

provision that allowed for Damon to make contact with DHHS for purposes of work with twenty-four hours advance notice. (See Bodman Dep. at 98-100.)

In January of 2008, Damon was arrested and charged criminally for continuing to contact Bodman at her residence, including slashing her tires. On or about February 25, 2008, Damon—who at the time was out on bail—left a phone message for Lapierre giving twenty-four hours advanced notice of his intention to visit the Marginal Way office in connection with his work for Shalom House. Upon hearing this message, Lapierre notified Bodman. At this point, Bodman informed Lapierre of Damon's arrest as well as her understanding that Damon's new bail conditions would override the twenty-four hour warning provision contained in the Final Order. After instructing Bodman to remain in the secure employee office area upstairs, Lapierre and Robitaille both stayed in the reception area for one to two hours on the day Damon was expected at the Marginal Way office. Damon never showed up.

Bodman generally kept her supervisors apprised of her legal proceedings and other matters related ongoing harassment by Damon; sometimes, if Bodman did not provide an update, Lapierre would check in with Bodman. On March 4-5, 2008, at Ms. Lapierre's request, Bodman sent emails to her supervisors summarizing the status of the criminal proceedings against Damon, including his bail conditions. In her email, Bodman reiterated that Damon's bail conditions prohibited him from entering DHHS' office and that the bail conditions trumped the provision in the Final Order which had allowed Damon access to DHHS' office with twenty-four hours notice. On March 14, 2008, Thomas Keyes, Deputy Director of the Office of Integrated Access and Support sent Damon a letter instructing him that he was not to enter or be anywhere on the property of the DHHS Marginal Way office. Bodman was informed that the letter was going to be sent, was consulted about Damon's address, and was in favor of sending it. (See

Bodman Dep. at 32-33.)  On May 8, 2008, Damon's bail conditions were amended to again allow him to enter DHHS' offices for work purposes with twenty-four hours advance notice.[9]

On May 7, 2008 Bodman sent an email to DHHS employee Jack Powers, who, at that time, was a non-supervisory child protective worker working in DHHS' Biddeford, Maine office. In this email, Bodman asked Powers whether he was in charge of the DHHS softball team.  The next day, after Powers responded by email that he was, in fact, the coach, Bodman sent a follow up email explaining her concerns about Damon being allowed to continue playing on the team as he had in the past.  More specifically, in this email, Bodman stated that Damon was on bail with pending criminal charges relating to Damon's behavior towards Bodman, including stalking. Bodman concluded this email with the following:  "Please be discreet with this information and, if you could possibly let me know whether or not he will be allowed on the team, I would appreciate it.  Sorry to have to lay this on you.  Thanks."  (Bodman Dep. at 111.)

The so-called "DHHS Softball Team" (the "Team") is part of a league known as the Portland Lawyer's League.  DHHS does not directly sponsor the Team and games are not held on DHHS property.  Coach Powers—who is a DHHS employee—exerts at least some control over who plays on the Team and relies on DHHS' email system to communicate with league officials and members of the Team.  Every year since 2000, Powers has used his DHHS email account and contacts to send an email to all DHHS employees asking them to contact him if they are interested in playing on the Team or know of someone else who might be.  Members of the Team likewise have made use of DHHS's email system and office space for meetings, and

_____

[9] By letter dated May 13, 2008. Damon's attorney forwarded the amended bail conditions to Keyes, stating that the District Attorney had no objection to the change and requesting that Keyes provide Damon a letter stating that Damon would again be allowed on DHHS premises with such notice.  DHHS asserts that, in response to the request, Keyes sent a second letter to Damon on May 22, 2008, amending his prior letter to conform to the change in the bail conditions.  DHHS has not provided a signed copy of this letter and Bodman challenges whether any such letter was ever sent out.  (See Pl.'s Opp'n Facts ¶49.)  Though the Court fails to see how these facts hurt Plaintiff's case, the Court does not consider these disputed facts in deciding this Motion.

DHHS has recorded the Team's exploits in employee newsletters. All of the team members have some direct connection to DHHS, with the vast majority of players being DHHS employees and the others being somehow affiliated with a DHHS employee by way of marriage, family, business association and the like. During the season, members receive between ten and twelve emails per week concerning the Team *via* the DHHS email system. Damon had played on the Team in the past and was a star player. Bodman was never a member of the Team, but did attend several games as a spectator in 2007 when she and Damon were still dating.

Powers and Damon were friendly on the Team, but they did not otherwise socialize outside of work. Prior to receiving Bodman's May 7, 2008 email, Powers had attempted to contact Damon to determine whether he was once again interested in playing on the Team during the 2008 season. Damon did not call Powers back until sometime after May 7, 2008. When he did so, Powers told Damon about the email that he had received from Bodman. In response, Damon told Powers that Bodman was harassing him and that she was "drumming" up allegations against Damon for the ongoing court proceedings. (Powers Dep. (Docket #26-2) at 18.) At Damon's request, Powers forwarded a copy of Bodman's May 7, 2008 email to Damon and faxed a copy of the email to Damon's attorney.

Damon was a member of the Team during some portion of the 2008 spring/summer season and attended at least one game. At some point during the season, Damon told Powers that Bodman had been twice investigated by child protective services without any negative finding. During one game, Damon again spoke to Powers about Bodman, this time informing him that Bodman was crazy and violent, that she was liar who was making up allegations in the court process, and that her daughter had run away from home. It is likely that a number of other DHHS employees overheard these comments Damon made to Powers about Bodman. After

these conversations with Damon, however, Powers did not make a child protective referral with respect to Bodman's child or take any other action based upon the allegations made by Damon.

One of Bodman's coworkers, Erik Lauritzen, overheard Damon's statements to Powers at the game and later relayed the conversation to Bodman. As a result, on May 15, 2008, Bodman went to Lapierre to ask that Damon be removed from the Team. Lapierre contacted Holly Pomelow, DHHS' EEO Coordinator, for guidance. On the same date, Damon filed a Motion to Amend the Final Order in Maine District Court, requesting that he be allowed to participate in the activities of the Team even if Bodman were present. Bodman's email to Powers was attached to Damon's Motion. The Motion was scheduled to be heard on May 30, 2008, but Damon did not appear for the hearing. The district court denied Damon's Motion and issued an order, dated May 30, 2008, prohibiting Damon from attendance and/or participation on the Team. That same day, Bodman sent an email to Powers and Lapierre informing them of the Judge's decision and asking them to provide confirmation after the order was relayed to the Team. Damon did not play on the Team after the May 30, 2008 court order.

On June 3, 2008, Bodman submitted to Lapierre a letter of resignation (dated June 2, 2008). In this letter, Bodman stated the following as the reason for her resignation: "Despite my efforts, I have not been able to keep myself safe and recent events have brought the harassment to my workplace and put me in a position of having to share details about my personal struggle with people that I didn't feel comfortable doing so. For these reasons, I feel I have no choice but to leave." (See Bodman Dep. at 114.) Lapierre asked Bodman if there was anything else that DHHS could do to help her and to keep her employed with DHHS, including offering Bodman the option of transferring to another part of the state. But Bodman declined, stating that she did not think DHHS could do anything else. Bodman also informed Lapierre that she simply wanted

to leave the state and was planning to move to North Carolina.[10]  Bodman told co-workers that her resignation was due to fear and being tired of having to "look over her shoulder" and because she was going to move to either North Carolina or South Carolina.  (Lauritzen Dep. (Docket #35-3) at 8.)  Bodman's last day of work was June 20, 2008.

In her position as a Family Independence Specialist, Bodman was covered by the collective bargaining agreement ("CBA") between the State of Maine and the Maine State Employees Association, Local 1989, SEIU ("MSEA") for the Professional and Technical Services Bargaining Unit.  Bodman spoke with her shop steward, Victoria Sovetsky, on a number of occasions in May and June of 2008 about the possibility of filing a grievance related to the events involving the DHHS Softball Team.  On June 3, 2008, the day she resigned, Bodman gave Sovetsky the go-ahead to file a grievance.  The grievance, which appears to have been filed on June 10, 2008, stated: "On May 30, 2008, an e-mail was sent regarding an individual on a softball team managed by Jack Powers advising an update on a PFA and asking for information.  To date, Mr. Powers has not responded and has, in the past, provided the defendant on the PFA copies of information provided by the Plaintiff on the PFA."  (Bodman Dep. at 115-16.)  DHHS never responded to this grievance.[11]  In March of 2009, Bodman filed a copy of the grievance with the Maine Human Rights Commission.

At the time he forwarded Bodman's email onto Damon and his attorney, Powers was aware that various DHHS policies would prohibit the use of state email to perpetuate harassment, sexual violence or stalking and that doing so was a punishable offense.  Powers was

---

[10] (See Bodman Dep. at 45 (answering "Yes, I did," to the question "So on June 3rd when you talked with her about resigning, you told her you were going to move out of state?"); id. (answering "Probably," to the question "Did you tell her it was North Carolina?").)

[11] In her deposition, Sovetsky testified that after she drafted the grievance on behalf of Bodman, MSEA headquarters in Augusta determined that the grievance should not proceed because Bodman was no longer an employee and there was no contract violation.  (See Sovetsky Dep. (Docket #44-5) at 8-9.)

subsequently counseled by Pomelow that it was not appropriate for him to have forwarded Bodman's email to Damon and that by doing so, he had exhibited poor judgment; he was not, however, otherwise formally disciplined for any specific violation of DHHS policy. Powers only received this counseling—which is the lowest form of punishment and thus cannot be formally grieved to the counseled employee's union—after Ms. Bodman had filed her Maine Human Rights Commission Complaint. Had Powers worked for Lapierre, she would have insisted on a higher level of discipline.

During the final years of her employment with DHHS, Bodman received positive performance reviews. Bodman was friendly with everyone and liked by nearly all of her colleagues. In 2008, DHHS was preparing a formal commendation for Bodman's work performance.

Damon eventually served time in jail for stalking Bodman and violating the Final Order; he was caught slashing the tires on Bodman's car while it was parked at her residence. None of the offenses for which Damon was convicted occurred in Portland, Maine where DHHS' Marginal Way office is located. In late 2007-2008, Damon also listed Bodman's name and cell phone number on Craigslist® as an escort or prostitute.

## III.    DISCUSSION

Based on these facts, Plaintiff filed this lawsuit alleging that Defendant violated federal and state law when it failed to protect her from ongoing harassment by Damon, a former coworker and boyfriend.[12] Specifically, in Counts I and II of her Complaint, Bodman alleges that when Defendant did not meaningfully address her requests for protection from abuse in the workplace, she was subjected to a hostile work environment, which led to her constructive

---

[12] Plaintiff originally filed her four count Complaint in state court on December 3, 2009 (Docket #2-2), and Defendant removed the lawsuit to this Court on March 11, 2010 (see Docket #1).

discharge, all in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4551 et seq. ("MHRA")

and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq. ("Title VII"). In

Count IV, Plaintiff additionally alleges that Defendant violated Maine's Whistleblowers'

Protection Act ("MWPA"), 26 M.R.S.A. § 831 et seq., when, following her reports of unlawful

conduct and harassment to her supervisors, her work environment further deteriorated, ultimately

leaving her no choice but to resign from her position.[13]  Plaintiff asks the Court to declare that

she was deprived of her rights and seeks unspecified damages, including damages for emotional

distress.

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Defendant now moves for summary

judgment in its favor on all three remaining counts.  Each of Plaintiff's claims will be addressed

in turn below.

### A.  Plaintiff's claims under Title VII and MHRA (Counts I & II)[14]

1.  Legal standard

Alleging that Defendant failed to adequately respond to her requests for protection from

abuse in the workplace, in Counts I & II Bodman brings both a hostile work environment claim

and a constructive discharge claim against Defendant.

"As a general proposition, a plaintiff may recover on a hostile work environment theory

---

[13] On June 22, 2010, this Court granted Defendant's Motion to Dismiss in part, dismissing Count III, a general sexual harassment claim, as duplicative, and dismissing any federal claim in Count IV because, *inter alia*, there is no federal Whistleblowers' Protection Act that applies to state government employees.  (See Order on Mot. to Dismiss (Docket #12) at 9-10 & 12 n.10.)

[14] Although Plaintiff fashions her complaint as two separate counts of constructive discharge (Count I) and hostile work environment (Count II), the Court discusses them together as Plaintiff asserts the same legal theory in both.

Additionally, to the extent Plaintiff makes the same claims under both federal and state law in Counts I and II, the same analysis applies.  See, e.g., Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 n.1 (1st Cir. 2007) ("Maine courts apply the MHRA in accordance with federal anti-discrimination law. Accordingly, the magistrate judge considered Forrest's MHRA claim and Title VII claim concurrently; we will do the same.") (internal citation omitted); Watt v. UniFirst Corp., 969 A.2d 897, 903 n.4 (2009) ("It is appropriate to look to analogous federal case law for guidance in the interpretation of the [MHRA].").  Thus, the Court's analysis while focusing on federal law applies with equal force to Plaintiff's state law claims.

when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Wilson, 2011 WL 977528, at *3 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted)). More specifically, to prove a claim of hostile work environment, Plaintiff must establish six elements:

> (1) that she … is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Agusty-Reyes v. Dep't of Educ., 601 F.3d 45, 52 n.6 (1st Cir. 2010) (citation omitted). These hostile work environment standards are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). "Although the workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins, the accumulated effect of repeated verbal attacks and physical intimidation in the workplace may reasonably be found to constitute sexual harassment within the meaning of Title VII." Rosario v. Dep't of Army, 607 F.3d 241, 247 (1st Cir. 2010) (citations and internal punctuation omitted).

"Alleging constructive discharge presents a 'special wrinkle' that amounts to an additional prima facie element." Landrau-Romero v. Banco Popular, 212 F.3d 607, 613 (1st Cir. 2000) (citation omitted); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004) (characterizing constructive discharge as a "compound" claim). That is, to prove her constructive discharge claim, Plaintiff must additionally establish that, as a result of Defendant's

acts or omissions, she experienced "working conditions so intolerable that a reasonable person would have felt compelled to resign." Id.

### 2. Hostile Work Environment Claim (Count II)

In moving for summary judgment on Count II, Defendant asserts that Plaintiff cannot establish at least three of the hostile work environment *prima facie* factors, namely: that Plaintiff was subjected to harassment based upon sex; that any such workplace harassment was severe or pervasive; and, finally, that there is some basis for employer liability. Because it largely disposes of Plaintiff's hostile work environment claim, the Court turns first to the "nub" of this case: the issue of employer liability. Wilson, 2011 WL 977528, at *4.

#### a. *Employer liability*

To recover on her hostile work environment theory, Plaintiff "must show that the employer is liable either for creating or for tolerating that atmosphere." Id. at *3. Here, Plaintiff's harasser was not a supervisor or a coworker, but a former employee. In seeking to impose employer liability on Defendant for Damon's actions, Plaintiff alleges that "Defendant … actively supported [her] harasser (a terminated former employee, no less), invited him to interact with their employees, supported those interactions, allowed him to defame her to her colleagues, and actively participated in illegal workplace activities." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n Mem.") (Docket #38) at 1.) The Court agrees with Defendant that the summary judgment record simply provides no support for these allegations.

Of course, "[i]t is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment." Beckford v. Dep't of Corrs., 605 F.3d 951, 957 (11th Cir. 2010). In Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848 (1st Cir. 1998), a case upholding both quid pro quo and hostile work environment Title VII sexual harassment liability against an employer for the conduct of a non-

employee, the First Circuit set forth the following standard: "employers can be held liable for a customer's unwanted sexual advances, if the employer ratifies or acquiesces in the customer's demands."  Id. at 854; see also id. at 855 ("This [hostile work] environment would be a product of [the company's president and sole shareholder] refusal to do anything about [the customer's unwanted sexual] advances… .").

In assessing employer liability for harassment by third parties when that conduct creates a hostile work environment, other Circuits "uniformly" have applied the so-called negligence standard.  Beckford, 605 F.3d at 957-58 (collecting cases).  That is:

> an employer may be found liable for the harassing conduct of [a non-employee] if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known.

Id. (quotation and internal punctuation omitted).  See also EEOC Regs., 29 C.F.R. § 1604.11(e) (2009) ("An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."); Maine Human Rights Comm'n, Emp't Regs., 11 CMR 94-348, ch. 3 § 3.06(I)(3) (reciting a similar standard).[15]

---

[15] This "negligence" standard is that same rule that applies to the assessment of employer liability for a hostile work environment created by a non-supervisory coworker.  Torres-Negron v. Merck & Co., 488 F.3d 34, 40 (1st Cir. 2007) (noting, in dicta, that "[o]ther circuits have addressed the question of employer liability in the case of harassment by non-employees, i.e., third parties.  Those courts seem to be in general agreement that such cases should be analyzed using the same standard that is applied in the case of co-employee harassment.") (citations omitted); see also Wilson, 2011 WL 977528, at *4 ("When coworkers … are responsible for the creation and perpetuation of a hostile work environment an employer can only be liable if the harassment is causally connected to some negligence on the employer's part.  In other words, the plaintiff must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action.") (citations and internal punctuation omitted).  And, indeed, this makes sense.  For, "regardless of whether the environment is created by a fellow employee or nonemployee, such as a customer, … 'the employer ultimately controls the conditions of the work environment.'" Aguiar v. Bartlesville Care Ctr., No. 10-5002, 2011 WL 1461541, at *5 (10th Cir. Apr. 18, 2011) (quoting Lockhard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998)).

In its Motion for Summary Judgment, Defendant asserts that the undisputed material facts establish that the vast majority of Damon's alleged wrongful acts were not work-related, occurred outside of the workplace and/or did not involve the use of Defendant-owned resources such as telephone or email. In response, Plaintiff "attempt[s] to manufacture an issue of fact in order to survive summary judgment," Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006), through the use of affidavit testimony asserting that much of Damon's conduct actually did occur in the workplace.[16] This affidavit testimony, however, directly contradicts Plaintiff's own unambiguous prior deposition testimony.[17] As Plaintiff has provided no explanation for the change in her testimony and has offered no additional record support, the Court has disregarded it. See Colantuoni v. Alfred Calcagni Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.") (citations omitted); see also Orta-Castro, 447 F.3d at 110-11; Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 n.3 (1st Cir. 2005).

Beyond establishing that her alleged harasser once worked for Defendant, Plaintiff has made no effort to identify "facts from which this Court can infer a connection between

---

[16] (See Bodman Aff. (Docket #36) ¶9 ("Mr. Damon slashed my tires at home. However, Mr. Damon did all other actions, including making threats via e-mail, phone, and in person to me while I was at home, in public and at work."); id. ¶10 ("Mr. Damon did numerous things at my work with DHHS, including inappropriate touching, inappropriate phone calls, voicemails, and other acts of harassment.").)

[17] Plaintiff clearly stated in her deposition that: other than the use of state email to contact her, none of the events detailed in her application for the Temporary Order occurred at work (see Bodman Dep. at 12-13); Damon's threats to take Plaintiff's daughter away and get Plaintiff fired were either on Plaintiff's personal phone, not her work phone (id. at 13) and/or took place in her apartment (id. at 14-15); when Damon stated that he hired someone to kill her, that was done in person in her apartment (id.); and when Damon called her derogatory names over the phone he again did so via her personal phone, not her work phone (id. at 15-16). In her deposition, she makes no mention of any non-consensual inappropriate touching in the workplace. What is more, all acts of physical restraint/assault detailed in Plaintiff's application for the Temporary Order were specifically described as taking place in her residence or car, not in her workplace (see id. at 97 (Temporary Order)).

[Damon's] alleged hostile sexual conduct and [her] employment." Geggatt v. Deese, No. 6:08-cv-1307, 2009 WL 2913533, at *5 (M.D. Fla. Sept. 10, 2009). Plaintiff "has cited no cases to suggest that employers have a duty under Title VII to protect employees off the work premises from the conduct of nonemployees, even if such conduct may be found to be severe in its sexual overtones." Holmes v. Utah, Dep't of Workforce Servs., 483 F.3d 1057, 1068 (10th Cir. 2007). Indeed, "as a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees," Geggatt, 2009 WL 2913533, at *5 (citations omitted), let alone interaction with a non-employee. Thus, to the extent Bodman seeks to hold Defendant liable for a hostile work environment created by Damon's tire slashing, physical restraint/assault, threats, verbal tirades, or any other harassment occurring indisputably outside of the workplace, Defendant is entitled to summary judgment.[18]

What is more, the record before the Court makes clear that Bodman did not confide her concerns relating to Damon to her supervisor until November 5, 2007—the very same day she later went to court to obtain a restraining order against Damon. (See, e.g., Bodman Dep. at 10 ("I didn't tell my supervisor about my problems until the same day I went to the court to get the [Temporary Order] … .")).[19] There is nothing in the record that suggests that Defendant had any

---

[18] Again, this includes nearly all of the abusive conduct described in Plaintiff's application for the Temporary Order, as well as Damon's alleged listing of Plaintiff as a female escort for hire on Craigslist®, Damon's stalking and repeated tire-slashing (for which he eventually was convicted and served jail time), all of which occurred outside of the workplace.

[19] In her deposition, Bodman stated in no uncertain terms that she first told her supervisor about the harassment immediately prior to leaving the office to head to court. Plaintiff, however, now attempts to characterize this material fact as disputed by relying on an arguably broader statement she made in a post-deposition affidavit. (See Pl.'s Opp'n Facts at 3 ¶20 (citing Bodman Aff. ¶7 ("I repeatedly told my supervisors about my problems with Mr. Damon. The first time I told them about those problems was in early November 2007, before I filed for a PFA against Mr. Damon, and I kept all supervisors informed until my resignation in June 2008."); see also Pl.'s Add'l Statement of Mat. Facts (Docket #35) at 16 ¶34 ("Ms. Bodman first came to Ms. LaPierre concerning Mr. Damon and his harassment and stalking before she obtained the temporary PFA.").) Plaintiff has provided no explanation as to why her testimony has changed. As such, to the extent this affidavit statement by Bodman contradicts her prior

knowledge of Damon's alleged harassment prior to Bodman's conversation with her supervisor on November 5, 2007.

Nor is there anything in the record that establishes that Defendant reasonably should have known about the alleged harassment at any earlier time. Indeed, prior to Plaintiff's November 5, 2007 revelation to her supervisor, the record contains no evidence suggesting that Defendant should have suspected that Bodman and Damon had any sort of intimate relationship. As such, before this November 5th conversation, Defendant could have reasonably concluded that any workplace contact between Damon and Bodman was professional and somehow connected to Damon's employment with the Shalom House. Thus, to the extent Plaintiff seeks to hold Defendant liable for a hostile work environment based on any of Damon's conduct that occurred before November 5, 2007, including the thirty-nine emails Damon sent to Plaintiff between September 18, 2007 and November 5, 2007, Defendant is entitled to summary judgment.

Upon being placed on notice of the alleged harassment, the summary judgment record also makes clear that Defendant took immediate steps to protect Plaintiff from any further contact with Damon in the workplace. The very same day that Defendant learned of Plaintiff's fears regarding Damon's behavior, Plaintiff's supervisor met with additional DHHS staff to come up with a plan to keep Bodman safe in the workplace. This safety plan broadly encompassed changes to Plaintiff's physical location (such as moving her parking space and relocating her out of the reception area on the day Damon was expected to be served with the Temporary Order), the provision of an escort (which Plaintiff utilized on at least one occasion), and the allowance of a flexible schedule so that Plaintiff could appear in court (which she utilized on the day she initially sought court protection from abuse and on other occasions as

---

unambiguous deposition testimony on this same point (if at all), the Court has again disregarded it in deciding this Motion. See Colantuoni, 44 F.3d at 4-5.

well). On that very same day, Defendant also took steps to change Bodman's email account address and instructed Bodman on how to block any further emails from Damon in the interim.[20]

Reviewing the facts in the light most favorable to the Plaintiff, as the Court must on summary judgment, it is true that Plaintiff was not involved in the development of this safety plan—the components of which Plaintiff largely took advantage only in the first few weeks. It is also true that the change to Plaintiff's email account apparently took three weeks to go into effect. Even taking these criticisms into account, the facts before the Court appear to depict an employer—and in particular, Plaintiff's supervisor Lapierre—that took Bodman's concerns quite seriously, showing deep compassion for an individual who undoubtedly was in crisis. Ultimately, however, the Court need not fully suss out the adequacy of Defendant's safety plan or the impact of any unnecessary delay in changing Plaintiff's email address. For, the record also makes clear that after November 6, 2007—when Damon likely was served with the Temporary Order[21]—Damon did not again use DHHS's telephone or email system to contact

---

[20] Once again, Plaintiff attempts to "manufacture an issue of fact," <u>Orta-Castro</u>, 447 F.3d at 110, through the use of affidavit testimony averring that no such plan was ever developed by Defendant. (<u>See</u> Bodman Aff. ¶ 12 ("After I told DHHS about Mr. Damon's harassment, they never developed a safety plan or communicated any safety plan to me.")). In her deposition, however, Plaintiff gave unambiguous testimony regarding the details of this very plan. (<u>See</u> Bodman Dep. at 18 (agreeing that she was assigned to a particular room for intake the day Damon was expected to be served with the Temporary Order, and agreeing that for a "short time" she parked in front of the building and had someone escort her to and from her car); <u>id</u>. at 21 (agreeing that a DHHS employee put in a request on November 6, 2007 to have her middle initial added to her email address); & <u>id</u>. at 22 (agreeing that she had discussed with Lapierre a plan to remove her from the reception area and have a supervisor stay in the reception area in the event Damon came into the building on any future occasion); <u>see also</u> Bodman Aff. ¶¶ 11, 13 (discussing in her affidavit testimony several components of this very safety plan).) Thus, to the extent Bodman's affidavit testimony contracts her earlier deposition testimony, if at all, the Court again disregards it. <u>Colantuoni</u>, 44 F.3d at 4-5.

[21] At 8:48 a.m. on November 6, 2007, Damon sent one last email to Bodman *via* her DHHS email account. The text of this email reads: "Good morning! Happy rainy day! Well, curious, can I still email you and get a respond (sic) to MaineCare questions? Just not friend questions? I am just curious, I do not have a motive. I thought we cared about one another at one time and how each other thought and felt, but I guess I must have miss understood (sic) you when you said that. Sorry. Just trying to be a civil (sic), I do care … ". (Bodman Dep. at 91.) Damon appears to have sent this final email to Bodman just prior to being served with the Temporary Order. In any event, the text of this email—though uninvited by Bodman and, given the context, likely sarcastic, insincere, and otherwise hurtful—does not contain any objectively harassing language and/or threats.

Bodman.  And, after November 5, 2007, Damon did not again enter Defendant's offices on Marginal Way during working hours.[22]

In short, once Defendant knew or had reason to know about Plaintiff's concerns with respect to workplace safety and her email account, Defendant took immediate corrective action. Thus, to the extent Plaintiff argues that she was subjected to a hostile work environment based on the adequacy of Defendant's workplace safety plan, Damon's visits to the workplace following his termination, and Damon's emails to Plaintiff's work email account, Defendant is entitled to summary judgment.

When the Court limits its examination to events that occurred after November 5, 2007 that were arguably connected to the workplace, what remains of Bodman's hostile work environment claim are 1) the incidents involving the DHHS Softball Team; and 2) Defendant's alleged failure to respond to Bodman's union grievance.   Defendant argues that it is entitled to summary judgment as to both remaining categories because the alleged hostile acts were neither sufficiently severe nor pervasive.  The Court agrees.

    *b.  Severe or Pervasive Harassment*

      *i.  Allegations involving the DHHS Softball Team*

In her Complaint, Bodman contends that Damon's attempts to play on the DHHS Softball Team in the Spring of 2008, Damon's alleged disparaging comments about Bodman to the coach

---

[22] In her affidavit, Plaintiff attempts to cast these material facts into doubt by stating "Mr. Damon continued to contact me at work after November 5, 2007." (Bodman Aff. ¶14.)  Again, however, this post-deposition affidavit testimony directly contradicts Plaintiff's own unambiguous deposition testimony addressing this very same question. (See Bodman Dep. at 14 (answering "No" to the question "[A]fter you got the protection from abuse order on November 5, 2007, did you get any further emails from Mr. Damon on your state email account?"); id. at 16 (answering "No" to the question "After the protection from abuse order on November 5, 2007, did you ever get any phone calls from Mr. Damon on your state line?"); id. at 19 (tr. at 38) (stating that after she got the protection from abuse order, Mr. Damon never came into the DHHS Marginal Way building).)  (As will be discussed in further detail below, Bodman does suggest in her affidavit that Damon attended softball meetings in the spring of 2008 at DHHS offices, but only "*after*" normal work hours."  (Bodman Aff. ¶15 (emphasis supplied.))  To the extent Plaintiff's affidavit testimony contradicts her earlier deposition testimony, the Court has again disregarded it. Colantuoni, 44 F.3d at 4-5.

and the team members, and Defendant's inadequate response to her request to have Damon removed from the softball team (including the specific actions of Coach Powers), created a hostile work environment for which Defendant is liable. The undisputed facts regarding the softball team include only the following: the DHHS Softball Team (the "Team") and Defendant share a name—which, of course, does not compel the conclusion that the Team was controlled by Defendant, but does suggest that there is some sort of affiliation.[23] It is also undisputed that the coach, a DHHS employee, made some use of Defendant's state email system for scheduling and other Team purposes, and also made a poor decision to forward to Damon a confidential email he received from Bodman—an action for which he was later counseled by Defendant. There is nothing in the record before the Court to suggest that Plaintiff attended any Team games, practice or meetings in the Spring of 2008, or had any other contact with Damon within the context of the Team.[24]

Examining these facts in the light most favorable to Plaintiff, as the Court must at this stage of litigation, the record reflects allegedly harassing behavior of a non-employee—during non-working hours, when Plaintiff was not present—and the less-than-commendable decision of one of Defendant's employees, Coach Powers. There is nothing in the record before the Court to suggest that Defendant either "ratified" or otherwise condoned Damon's conduct. See Rodriguez-Hernandez, 132 F. 3d at 854 ("[E]mployers can be held liable for a [third party]'s unwanted sexual advances, if the employer ratifies or acquiesces in the [third party]'s demands."). And, far from "tolerating" Coach Powers' actions, Defendant affirmatively

---

[23] Though, it is worth noting that this Team is apparently part of the Portland Lawyers League, although clearly non-lawyers, such as Damon and the coach, Powers, are allowed to be players.

[24] Without any record support beyond her own affidavit testimony, which is based upon hearsay rather than personal knowledge, Plaintiff additionally alleges that Defendant provides financial support for the Team, including uniforms, that some Team meetings occurred in the Marginal Way office, and that Defendant ultimately controls who plays on the Team—all of which Defendant disputes. As will be explained below, none of these factual disputes ultimately proves to be material.

disciplined him for the poor judgment he exhibited in deciding to forward Bodman's email to Damon. See Wilson, 2011 WL 977528, at *3 ("[T]he plaintiff must show that the employer is liable either for creating or tolerating that [hostile or abusive] atmosphere."). In short, the record to support imposing employer liability on Defendant for the events surrounding the Team is weak, at best.

Even assuming that there is some basis for employer liability, however, the Court would still find that Plaintiff's claim falls short. For, while Damon's antics with regard to the softball team may have been personally hurtful to Plaintiff, the Court is not convinced that it amounts to harassment that was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21; see also Oncale, 523 U.S. at 81 (Title VII is not a "general civility code."). The Team presented no opportunity for Damon to have actual contact with Plaintiff. The complained-of harassment was infrequent (appearing to have been no more than a series of isolated incidents), not physically threatening, and in no way interfered with Plaintiff's work performance—which, by all accounts, continued to be exemplary. In short, as Plaintiff has not offered proof of little more than "offhand comments, and isolated incidents," her hostile work environment claim cannot survive summary judgment. Farragher, 524 U.S. at 788.[25]

---

[25] See also Rosario, 607 F.3d at 246-47 ("There is no precise formula for establishing sufficiently egregious conditions. 'We examine all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.'") (quoting Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006)); Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003) (no hostile work environment where "the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [the plaintiff's] work performance."); Blake v. State, 868 A.2d 234, 238 (Me. 2005) (rejecting hostile work environment claim where the conduct failed to rise to a severe or pervasive level).

*ii. Allegations involving Bodman's union grievance*

Plaintiff also alleges as part of her hostile work environment claim that Defendant never responded to the grievance she filed under her collective bargaining agreement. Defendant asserts that no such grievance was ever filed, and in any event, its failure to respond in no way constitutes evidence of a hostile work environment because the conduct is neither sufficiently severe nor "based upon sex."

The facts before the Court, when examined in the light most favorable to Plaintiff, establish that Plaintiff authorized the filing of her grievance on June 3, 2008—the very same day she submitted her resignation. In other words, regardless of whether or not this grievance was ever actually filed, the record makes clear that Plaintiff quit before Defendant would have even had the opportunity to respond to her claims. As such, the Court is hard pressed to understand how an alleged omission that occurred *after* Plaintiff left the work environment can possibly be considered as part of her hostile work environment claim.

In short, to the extent Plaintiff seeks to hold Defendant liable for a hostile work environment based on its failure to respond to her grievance or to take it seriously, Defendant is entitled to summary judgment.

*c. Harassment "based upon sex"*

For the sake of completeness of the record, the Court briefly returns to the emails Damon sent to Bodman's work email account prior to November 6, 2007. The summary judgment record includes thirty-nine emails that were sent by Damon to Plaintiff's state email account between September 18, 2007 and November 6, 2007. (Bodman Dep. at 46-91.) It is undisputed that these emails ceased completely after Damon was served with the Temporary Order on November 6, 2007—which was one day after Bodman first informed her supervisor about her problems with Damon. (See Bodman Dep. at 14.)

As the Court has already held, Defendant is not liable under a hostile work environment theory for this conduct by Damon, a non-employee, because Plaintiff has failed to show that Defendant knew or should have known of the harassment and failed to take immediate corrective action. Even if the Court were to assume, however, that there was some basis for employer liability for the emails Damon sent to Bodman's work account, the Court would still hold that Defendant is not liable for the content of these emails. For, Plaintiff has also failed to establish that the content of these emails reflect harassment "based upon sex." <u>Agusty-Reyes</u>, 601 F.3d at 52 n.6.

The Court has reviewed all thirty-nine emails. The Court has no reason to doubt that these emails were unwanted by Plaintiff—or that the seemingly endless receipt of so many unsolicited and unreturned emails to her work email account was both frightening and frustrating. However, these emails simply do not contain any language that even arguably contains sexual content or is otherwise derogatory towards women. Rather, they appear to reflect Damon's unsolicited, unwanted and ultimately ill-advised attempt to re-establish a relationship with Bodman, with an occasional professional work email thrown into the mix.[26] In short, the emails do not constitute proof of a hostile work environment. <u>See, e.g.</u>, <u>Faragher</u>, 524 U.S. at 788 (noting that Title VII is not intended to be a "general civility code").

---

[26] (<u>See, e.g.</u>, Bodman Dep. at 46 (9/18/07: "Just wanted to touch base, hopefully we can converse, I do miss you… . If you are not busy Friday, maybe want to get dinner together?"; <u>id</u>. at 50 (9/21/07: "Angela: do you honestly really hate me that much to not even reply to anything I have sent? … I just want to be a supportive friend … ."); <u>id</u>. at 55 (9/26/07: "Also, curious if you want to go out dancing with your man and others in a few weeks… ? I would like to just see you as a friend … Sorry you felt the need to change your phone number … ."); <u>id</u>. at 56 (9/26/07: "I think my fucking car is dying and I have no money or support to help … my life is ending and it sucks … have a great day!"); <u>id</u>. at 59 (10/1/07: work related question regarding MaineCare benefits, to which Plaintiff responds); <u>id</u>. at 66 (10/19/07: "Hello Angela, just wanted to say, 'hi'… take care of yourself!"); <u>id</u>. at 78 (10/31/07: "I guess you seem to be above me and don't want to stoop down and talk to an individual you deem less … ."); <u>id</u>. at 80 (11/2/07: work related question regarding MaineCare benefits, to which Plaintiff responds); & <u>id</u>. at 90 (11/5/07: "I guess ignoring someone is the best policy from you. I am sorry, thought maybe being civil would be 'ok' but you think otherwise, why is that you cant (sic) even reply?").)

Of course, a prior failed relationship between an accused harasser and an alleged victim does not preclude a finding of sexual harassment. See Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225 (1st Cir. 2007). In Forrest, however, there was evidence that the accused harasser directed sexually degrading, gender-specific epithets towards the victim at work. Id. at 227, 229-30. Unlike the facts presented in Forrest, here there is no such evidence. Therefore, Bodman's failure to establish that Damon's harassment towards her in the workplace was sex-based constitutes an alternative ground for granting summary judgment to this portion of Plaintiff's hostile work environment claim. See, e.g., Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 262-64 (E.D.N.Y. 2005) (granting motion for summary judgment where, *inter alia*, allegedly harassing statements by coworker were motivated solely by his anger toward the plaintiff following their failed relationship).[27]

Thus, for the reasons explained herein, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim (Count II) in its entirety.

### 3. Constructive Discharge Claim (Count I)

In Count I, Plaintiff further contends that, as a result of Defendant's failure to act in response to her complaints about Damon's behavior, her working conditions became so intolerable that she was left with no choice but to resign from her position—*i.e.*, she was constructively discharged.

The Court has found that Plaintiff has failed to prove her hostile work environment claim. As constructive discharge essentially amounts to an additional element of her prima facie case, without first establishing that her work environment was hostile, Plaintiff cannot establish constructive discharge. See Pennsylvania State Police, 542 U.S. at 147; Landrau-Romero, 212

---

[27] While it is true that "incidents of nonsexual conduct… can in context contribute to a hostile work environment," O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001), here the emails stand alone as the only evidence of potential workplace harassment occurring at the time.

F.3d at 613; Hernandez-Torres v. Intercont'l Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998).  In any event, for the reasons already stated above, the Court also concludes that Plaintiff has failed to establish that, as a result of Defendant's acts or omissions, she experienced "working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police, 542 U.S. at 147.  In the words of the First Circuit, "'constructive discharge' usually describes harassment so severe and oppressive that staying on the job while seeking redress is intolerable.  Here, none of [the alleged] actions were of such magnitude that [Plaintiff] was prevented from staying on while seeking remedies for any harm [s]he had suffered."  Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 10 (1st Cir. 2001) (citations omitted); see also Davis v. Cumberland Cnty., No. 04-143-P-S, 2005 WL 1412419 (D. Me. June 16, 2005) ("Seeking relief while staying on the job is 'the rule save in exceptional cases.'") (quoting Lee-Crespo, 354 F.3d at 45).

In short, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim (Count I).

**B.  Plaintiff's Whistleblowers' Protection Act Claim (Count IV)**

This brings the Court to Plaintiff's final remaining claim.  In Count IV, Bodman alleges that Defendant violated Maine's Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 831 et seq., when it retaliated against her after she made reports protected under the state law. Defendant moves for summary judgment, arguing that Bodman has failed to establish a prima facie MWPA claim.  The Court agrees.

1.  Legal Standard

"The MHRA provides a right of action to persons who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions."  Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1053

(Me. 2008). See also 5 M.R.S.A. §§ 4572(1)(A) & 4621; 26 M.R.S.A § 833. Under the MWPA, an employee has engaged in protected activity if she has "report[ed] orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States[.]" 26 M.R.S.A. § 833(1)(A). The Law Court has established that to prevail on a claim pursuant to the MWPA, the employee must establish three elements:

> (1) [s]he engaged in activity protected by the [M]WPA; (2) [s]he experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.

Stewart-Dore v. Webber Hosp. Ass'n, 13 A.3d 773, 775 (Me. 2011) (citation omitted); see also Tripp v. Cole, 425 F.3d 5, 9 (1st Cir. 2005). Thereafter, the burden shifts to Defendant to set forth a legitimate, non-retaliatory motive for the adverse employment action. See DiCentes v. Michaud, 719 A.2d 509, 514 (Me. 1998); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).

2. Analysis

The Law Court has firmly established that the protection afforded by the MWPA is "unambiguously limit[ed] … to (1) employees (2) who report to an employer (3) about a violation (4) committed or practice by that employer." Costain, 954 A.2d at 1054. As such, in the Court's prior Order on Defendant's Motion to Dismiss, the Court excluded from Plaintiff's MWPA claim any allegations related only to Damon's own conduct, because he was a non-employee during all relevant time periods. (See Order on Mot. to Dismiss at 13.) The Court thus cabined Plaintiff's claim to only two instances in which she arguably may have engaged in protected activity: (1) when she complained to her "supervisor and other staff" about Damon's involvement with the DHHS Softball Team and Coach Powers' actions; and (2) when, based

upon Coach Powers' actions, she filed a Union grievance on the day she resigned, to which she alleges Defendant did not respond.

The MWPA "does not protect every complaint" made by an employee, <u>Stewart-Dore</u>, 13 A.3d at 776, and it is far from self-evident that Bodman has actually engaged in activity protected by the MWPA. For example, there is nothing in the record to suggest that Bodman reported that she believed Powers' forwarding of the email was illegal or sexual harassment. <u>See, e.g.</u>, <u>Stinson v. Simplexgrinnell LP</u>, 394 F. Supp. 2d 280, 282 (D. Me. 2005) ("I conclude that despite ample opportunity to do so, the plaintiff has failed to allege that she complained to her employer that the work environment was sexually hostile, such that her termination could be viewed as retaliation for protected activity."); <u>see also</u> <u>Bard v. Bath Iron Works Corp.</u>, 590 A.2d 152, 154 (Me. 1991) (holding that a report of an alleged violation of a collective bargaining agreement or agency policy are not protected under the MWPA). However, even assuming that Bodman "ha[d] reasonable cause to believe" that these acts or omissions were in violation of state or federal law, 26 M.R.S.A. § 833(1)(B), Plaintiff still cannot establish her prima facie case.

With respect to the adverse action element, Plaintiff appears to claim that her constructive discharge constitutes the requisite "adverse action." To date, however, it remains an open question in Maine whether a retaliatory hostile work environment (and resulting constructive discharge) constitutes an adverse employment action in the context of a MWPA claim. <u>See</u> <u>Blake</u>, 868 A.2d at 238 ("We have not yet addressed whether a hostile work environment claim can constitute an adverse employment action pursuant to the WPA.") (citing <u>Doyle v. Dep't of Human Servs.</u>, 824 A.2d 48, 57 (Me. 2003)). In any event, the Court has already determined that the hostility in the work environment was neither severe nor pervasive.

Perhaps more importantly, as to the third element, the current record does not establish that there is any causal link between the alleged protected action and the alleged adverse

employment action. In her deposition, Plaintiff unambiguously stated that she told her supervisor that she was moving out of state when she resigned on June 3, 2007. And, as the Court has already discussed, Plaintiff resigned before Defendant failed to respond to her grievance, not the other way around.

Thus, Plaintiff has failed to establish her prima facie case, and Defendant is entitled to summary judgment on Plaintiff's MWPA claim (Count IV).

## IV.    CONCLUSION

For the reasons explained herein, the Court GRANTS Defendant State of Maine, Department of Health and Human Services' Motion for Summary Judgment (Docket #25) and orders that judgment enter in favor of Defendant on all remaining counts.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 26th day of May, 2011.